Filed 8/28/25  P. v. Crenshaw CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ROBERT ODELL CRENSHAW,<br><br>Defendant and Appellant. | B335405<br><br>(Los Angeles County<br>Super. Ct. No. BA024364) |

APPEAL from an order of the Superior Court of Los Angeles County, Michael V. Jesic, Judge.  Affirmed.

Richard B. Lennon, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Kenneth C. Byrne and Blake Armstrong Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Robert O. Crenshaw was tried and convicted of the robbery and murder of Timothy Ellerson, the attempted murder of Dwayne Haley, and the robbery and murders of Tracy Bolton and Derrick Turner. He filed a petition for resentencing under Penal Code section 1172.6.[1]  The trial court denied the petition in full after an evidentiary hearing.  It found that appellant was ineligible for relief because he was the direct perpetrator of the crimes involving Haley, Bolton, and Turner, and was a major participant who acted with reckless disregard for human life in connection with the robbery and murder of Ellerson.

Appellant contends that substantial evidence does not support the court's findings regarding his involvement in the crimes against Ellerson.  We disagree and affirm.

BACKGROUND

## I. Convictions

### A. Procedural History

Appellant and a codefendant, Richard Whitehurst, Jr., were jointly charged with, tried for, and convicted of the 1989 robbery (§ 211) and first degree murder (§ 187, subd. (a)) of Ellerson; the contemporaneous attempted murder of Haley (§§ 187, subd. (a), 664); and the 1990 robbery (§ 211) and first degree murders (§ 187, subd. (a)) of Tracy Bolton and Derrick Turner. The jury found robbery-murder special circumstances allegations (§ 190.2, subd. (a)(17)) true as to all three murders, and also found true a multiple murder special circumstance

---

[1]     Effective June 30, 2022, Penal Code section 1170.95 was renumbered section 1172.6, with no change in text (Stats. 2022, ch. 58, § 10).  All further statutory references are to the Penal Code unless otherwise indicated.

allegation (§ 190.2, subd. (a)(3)).  The trial court sentenced appellant to a term of life in prison without parole (LWOP) for the Ellerson murder, a concurrent term of life imprisonment for the Haley attempted murder, and imposed and stayed the midterm of three years for the Ellerson robbery.  It sentenced appellant to a consecutive LWOP term for the Bolton murder, a concurrent LWOP term for the Turner murder, and imposed and stayed the midterm of three years for the Bolton and Turner robbery.  We affirmed appellant's convictions on direct appeal. (*People v. Whitehurst* (Nov. 16, 1994, B071419) [nonpub. opn.].)

### B.     Factual Background

#### 1.       1989 Crimes

Haley testified that he and Ellerson were longtime friends. On three or four occasions in 1989, they purchased large quantities of cocaine from Whitehurst, who was a manager at Geraldine's, a Los Angeles nightclub.  During these transactions, which took place at Geraldine's, Ellerson bought the cocaine from Whitehurst for $15,500 per kilo; Haley acted as Ellerson's bodyguard.

On June 21, 1989, Haley and Ellerson wanted to purchase a kilo of cocaine from Whitehurst.  In a departure from the typical procedure, Whitehurst told them to wait a few blocks away from Geraldine's, where he would meet them with the cocaine.  Haley and Ellerson became uneasy waiting at the appointed location, so they went to Geraldine's.  When they arrived, Whitehurst said his supplier would be there soon and invited Haley and Ellerson to wait at the club.  After awhile, Whitehurst received a phone call and went into the kitchen. When he returned, he informed Haley and Ellerson that they would have to leave and meet the supplier elsewhere to get the

3

cocaine.  Whitehurst told Ellerson that the two of them would go, and Haley could wait at the club.  Haley watched Ellerson and Whitehurst leave in Whitehurst's white car; Whitehurst was driving, and Ellerson had a yellow gym bag containing $15,500 in cash.

After waiting for a "kind of long" time, Haley paged Ellerson a few times.  He received no response.  Concerned, Haley sent Ellerson an "emergency page" using a special code. He again received no response.  About 10 to 15 minutes later, appellant entered the club, wearing a Geraldine's security jacket.  Appellant walked over to Haley and, using Haley's nickname, told Haley that Whitehurst and Ellerson had told appellant to come get Haley and "bring you around the corner because things took longer than they thought."  Haley had neither seen nor spoken to appellant before, but concluded "he knew what was going on" since he had used Haley's nickname and referred to Ellerson and Whitehurst.  Haley left the club with appellant, and the two of them got into Haley's car.

Haley drove, and appellant gave Haley directions.  After they drove up and down the same street multiple times, appellant directed Haley to park on the street behind a red truck, about three or four houses from a cross street.  Appellant got out of the car and said he needed to make sure they were at the right house.  Haley stayed in the running car and locked the doors. As he waited for appellant to return, he saw a white car drive past on the cross street several times.

When appellant returned to the car, Haley reached over to unlock the door and saw appellant draw a gun to the window.  Haley "threw" the car into gear and sped away as appellant opened fire.  Haley heard the car windows shattering and felt a

4

sharp pain in his back. Haley turned onto the cross street, and found the white car trying to block his path. He saw Whitehurst in the driver's seat, illuminated by his headlights.

Haley managed to get around Whitehurst and drive to his sister's house nearby. His sister called an ambulance. Haley was transported to the hospital, where he was treated and released the following morning.

Around 12:50 a.m. on June 22, 1989, Hawthorne police received a "shots fired, man down" radio call. Officer James Kerns responded to the intersection of 139th Street and Lemoli, where he found Ellerson lying facedown in a pool of blood. He had a pager clipped to his waist. No gym bag was nearby. A medical examiner testified that Ellerson suffered two fatal gunshot wounds to the back of the head and a potentially, but not immediately, fatal gunshot wound to the abdomen.

Within a week or two of the shootings, Haley accompanied police to Geraldine's. He was unsure if he recognized anyone there as the person who shot him, but identified Whitehurst's car. Whitehurst previously had been ticketed while driving a white car matching Haley's description; it was registered to Whitehurst's girlfriend.

In August 1990, approximately 14 months after the 1989 crimes, Haley again returned to Geraldine's, this time with his sister. As they were driving through the parking lot, Haley saw appellant and told his sister, "'That's the fool that shot me.'" Haley repeated the identification to a Los Angeles County Sheriff's detective, and later identified appellant as the person who shot him in a photo array and at trial.

5

### 2. 1990 Crimes

Melvin Lester testified to the following. In or around July 1990, Lester moved to the Los Angeles area from Oakland. He stayed with his "good friend" Whitehurst and worked at Geraldine's as a security guard. Lester was friends with Bolton and Turner, who still lived in Oakland. The three sold drugs together, and Lester had a plan to "get a hookup" for large quantities of cocaine in the Los Angeles area and "really take the market" in Oakland.

A week or so before they were killed, Bolton and Turner came to visit Lester and brought approximately $10,000 with the hopes of purchasing a half kilo of cocaine. Lester and Whitehurst picked them up at the airport, and "wined and dined" them at Geraldine's. Lester was unable to find someone willing to sell a half kilo of cocaine, however, and he heard appellant and Whitehurst separately mention plans to rob Bolton and Turner. Somewhat concerned, Lester "[s]ent them back to Oakland." Bolton and Turner planned to come back with more money once Lester found "a solid hookup" for a full kilo.

On August 13, 1990, Lester learned that Bolton and Turner were on a flight to Los Angeles despite their plan to wait until Lester found a supplier. Lester picked them up at the airport; they had a burgundy gym bag with them. Lester took Bolton and Turner to Geraldine's, where Whitehurst told them he had a supplier. The four men went into a back office, and Whitehurst used the phone there to call appellant and arrange a sale.

After appellant arrived, the club closed for the night. Only appellant, Whitehurst, Lester, Bolton, Turner, and another man, Dominique Titus, remained. Titus held Bolton and Turner at gunpoint while Whitehurst retrieved the burgundy bag from

6

Lester's car. Lester heard Bolton and Taylor being "roughed up," and saw appellant and Titus with bundles of money. Appellant also had a .45 handgun that Lester had seen him with in the past. At some point, Titus went outside and returned with wire, which was used to bind and gag Bolton and Turner. Bolton, who had medical conditions and took asthma medication, grunted and struggled; Lester told the others that Bolton was having an asthma attack. Appellant responded, "He's going to die anyway."

After some discussion of where they should go—as "far away as possible from the club where it wouldn't come back on the club"— appellant and Titus brought Bolton and Turner outside and put them into the trunk of appellant's car. Appellant got into the driver's seat and left. Whitehurst and Lester left in Whitehurst's car, and Titus left in his car. All three cars stayed together during the ensuing drive; they ultimately stopped in a parking lot. Appellant removed Bolton and Turner from the trunk, while complaining to Lester and Whitehurst that they had "fucked his trunk up." As Bolton and Turner lay on the ground, Whitehurst handed appellant a gun and told appellant to "[h]urry up and get it over with so we can get out of here." Whitehurst and Lester then left the parking lot and parked at a nearby curb. Lester heard multiple gunshots before they left. He told Whitehurst, "It sounded like a shot," and Whitehurst shook his head, smiled, and turned up the radio.

Law enforcement found Bolton and Turner lying dead in the parking lot the following morning near two .45 caliber slugs. A medical examiner testified that Bolton sustained a fatal gunshot wound to the back of the head, and two additional gunshot wounds to the shoulder and wrist. Turner was fatally shot in the back, and was also shot in the shoulder and buttock.

7

Both men had paint flecks on their bodies that matched the paint from the scratched-up interior of appellant's trunk. A ballistics expert opined that the slugs were fired from the same gun that had been used in the Haley shooting.

Several days later, appellant told Lester he had killed Bolton and Turner. Lester noticed that appellant was wearing a pendant and watch that looked like Turner's.

## II. Section 1172.6 Proceedings

In 2019, appellant filed a petition for resentencing under section 1172.6. The trial court denied the petition at the prima facie stage. Appellant appealed, and the People conceded that his petition made a prima facie case for relief. We reversed and remanded the matter to the trial court for issuance of an order to show cause and evidentiary hearing. (See *People v. Crenshaw* (Aug. 30, 2022, No. B312025) [nonpub. opn.].)

On remand, the parties filed additional briefing. The People argued that appellant was ineligible for relief for the Bolton and Turner murders and Haley attempted murders because he was the actual perpetrator of those crimes. They also argued he was ineligible for relief as to the Ellerson murder, as well as the other crimes, because he was a major participant in the underlying robberies and acted with reckless indifference to human life. Appellant argued that the evidence would not show beyond a reasonable doubt that he was a major participant who acted with reckless indifference to human life.

At the evidentiary hearing, the People reiterated their contention that appellant directly perpetrated the murders of Bolton and Turner and the attempted murder of Haley. With regard to Ellerson, they conceded that "[w]e don't know who actually shot Mr. Ellerson." However, they asserted that

8

appellant and Whitehurst jointly robbed Ellerson, and appellant's shooting of Haley was in furtherance of that robbery, namely an attempt to eliminate Haley as a witness. They argued that it "was clearly a planned, coordinated effort to take the money away from these 2 men. The testimony by Mr. Haley was that he was supposed to serve as the security, as the backup for Mr. Ellerson who actually had the money. And so the plan was to separate those 2 men so that it would be easier to take the money and eliminate each of them as witnesses. And, specifically, there was evidence that the car that was being driven by Whitehurst that night was used to try to kill Mr. Haley. It shows that Whitehurst and Crenshaw are working together at that stage. And so it's clear that they planned it together. It was all part of the same transaction. [Appellant] is in fact a major participant acting with reckless indifference for the murder of Mr. Ellerson, as well."

Appellant's counsel responded by pointing to appellant's trial testimony that he was not present for and did not participate in any of the crimes. Counsel further argued that there was nothing connecting appellant to the Ellerson murder, which he argued "was committed by Whitehurst because Whitehurst leaves with Ellerson . . . a good period of time before my client is alleged to have been involved in anything. . . . There's nothing to indicate that my client was directly involved either as the actual killer or participated in the actual killing of Mr. Whitehurst [*sic*] because all of that takes place way in advance of anything that happens with Mr. Haley." With respect to the Bolton and Turner murders, appellant's counsel argued that Lester's testimony about appellant's involvement was not credible because he "was as much an accomplice as anyone could be an accomplice in a situation like this. He knew Bolton. And

9

he knew Turner from before from Oakland. And he was the 1 who helped set up everything.  He had every reason – every motive here to lay out other people like Mr. Crenshaw than himself [*sic*] because he was the 1 who was so directly involved and who was the real conspirator here who set up and had Bolton and Turner murdered. . . .  And based upon that, together with my client's testimony that he wasn't present during the Bolton, Turner murders, in combination with the clear motive and bias and reason to lie that . . . Mr. Lester had, . . . prosecution has failed to prove beyond a reasonable doubt that my client could be convicted of those murders under current law."

The trial court denied the petition in full.  First, it found that the People proved beyond a reasonable doubt that appellant was the actual shooter of Bolton and Turner.  The court stated that Lester's testimony alone was enough to sustain the burden, but "the corroboration that really seals it for Mr. Crenshaw" was "that the same gun that was used on Mr. Haley…c[a]me back to the casings as to the other case where Mr. Crenshaw is accused of being the actual shooter."  The court further found beyond a reasonable doubt, "based on all the testimony I've read," that appellant was the actual shooter in the attempted murder of Haley.  With respect to Ellerson, the court found "that the evidence is overwhelming that he was a major participant and had reckless disregard for human life as to that murder. He was not present at that murder.  I'm convinced of that.  As [the People have] pointed out nobody knows who actually committed that murder. . . .  But Mr. Crenshaw's involvement was so intertwined with the entire transaction from beginning to end. . . .  [A]ll this is definitely beyond a reasonable doubt that he was trying to kill Mr. Haley to further the robbery."

10

# DISCUSSION

## I. Section 1172.6

In January 2019, the Legislature "'amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.'" (*People v. Curiel* (2023) 15 Cal.5th 433, 448, quoting Stats. 2018, ch. 1015, § 1(f) (*Curiel*).)  As amended, section 188, subdivision (a)(3) now provides: "[I]n order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime."  (§ 188, subd. (a)(3).)

A person convicted of murder or attempted murder under a now-invalid theory may petition the trial court to vacate the conviction and be resentenced on any remaining counts. (§ 1172.6, subd. (a).)  Upon a prima facie showing, the court must issue an order to show cause and hold an evidentiary hearing at which the prosecution bears the burden "to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder" under current law.  (§ 1172.6, subds. (c), (d)(3).) At this hearing, the trial court acts as an independent factfinder and may consider evidence admitted at any prior hearing or trial that is admissible under current law, or any new or additional evidence submitted by the parties.  (§ 1172.6, subd. (d)(3).)  The court "must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard. . . ." (*People v. Clements* (2022) 75 Cal.App.5th 276, 298 (*Clements*).)

11

## II. Standard of Review

We review the trial court's findings after a section 1172.6, subdivision (d)(3), evidentiary hearing for substantial evidence. (*Clements*, supra, 75 Cal.App.5th at p. 298; *People v. Mitchell* (2022) 81 Cal.App.5th 575, 591 (*Mitchell*).) Under this standard, we "'examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt.'" (*Clements*, *supra*, at p. 298.) Substantial evidence includes both circumstantial evidence and reasonable inferences drawn therefrom (*People v. Brooks* (2017) 3 Cal.5th 1, 57), and we presume in support of the judgment the existence of every fact that can be reasonably deduced from the evidence. (*People v. Owens* (2022) 78 Cal.App.5th 1015, 1022.) We do not resolve credibility issues or conflicts in the evidence. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

## III. Analysis

Appellant contends the court erred by denying his petition with respect to the Ellerson murder. He argues that the ruling was not supported by substantial evidence, and the "minuscule evidence presented in this case related to the Ellerson murder belies any finding that appellant was a major participant who acted with reckless indifference." Specifically, he contends "there was no evidence of how and by whom [Ellerson] was actually robbed or shot or under what circumstances," and suggests that "[i]t could have been that that was solely planned by Whitehurst or not planned at all until something happened after Ellerson left with Whitehurst from the club. That Whitehurst later called

12

appellant and directed him to take Haley and kill him could just as easily have arisen after Ellerson had been robbed and killed, when Whitehurst or someone else decided that something thus needed to be done with Haley who had come with Ellerson to the club."

We reject these contentions to the extent they challenge the validity of the underlying robbery conviction and the jury's findings related to that conviction. A section 1172.6 petition "does not afford the petitioner a new opportunity to raise claims of trial error or attack the sufficiency of the evidence supporting the jury's findings." (*People v. Farfan* (2021) 71 Cal.App.5th 942, 947.) The purpose of section 1172.6 "'is to give defendants the benefit of amended sections 188 and 189 with respect to issues not previously determined, not to provide a do-over on factual disputes that have already been resolved.'" (*Ibid.*; see also *Curiel*, *supra*, 15 Cal.5th at p. 460 ["issue preclusion will 'ordinarily' apply in such proceedings"].) By finding appellant guilty of robbing Ellerson, the only named victim in that count, the jury necessarily found that appellant was aware of and involved in the robbery, whether as a direct perpetrator or as an aider and abettor. That means the jury also necessarily found that the robbery, which was committed sometime after Whitehurst and Ellerson left Geraldine's with the yellow gym bag, was related to appellant's later interactions with Haley and was not, as appellant now speculates, a wholly separate endeavor. We do not revisit those findings now.

We further reject appellant's contention that substantial evidence does not support the trial court's findings that he was a major participant who acted with reckless indifference. In *People v. Banks* (2015) 61 Cal.4th 788, 794 (*Banks*), the California

13

Supreme Court set forth several factors relevant to determining "under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant" in a felony resulting in death. Those factors are: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Id.* at p. 803, fn. omitted.) "No one of these considerations is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.' [Citation.]" (*Ibid.*)

Here, substantial evidence supports the inference that appellant played a key role in planning the crimes. During his very first interaction with Haley, appellant addressed him by his nickname and demonstrated knowledge both that Haley was connected to Ellerson and that Ellerson and Whitehurst were together. As the People argue, this "suggests that appellant was in communication with Whitehurst during the time period that Ellerson went missing and then worked with Whitehurst to lure Haley—Ellerson's bodyguard and the sole potential witness—to an area where he attempted to kill him." Indeed, in an era before cell phones enabled both easy contact and location tracking,

14

appellant directed Haley to an area where Whitehurst was driving around, further demonstrating communication and coordination.

Substantial evidence also showed that appellant used a lethal firearm against Haley. Since the jury necessarily found that the crimes against Haley and Ellerson were connected, this second *Banks* factor also suggests major participation. So does the related third *Banks* factor, the defendant's awareness of weapons used and particular dangers posed by the nature of the crime. Although neither the trial court nor the parties appear to have considered the point, "[s]everal cases have recognized a vehicle as a deadly weapon based on the manner it was used." (*People v. Perez* (2018) 4 Cal.5th 1055, 1065.) Here, the evidence suggests appellant was aware of Whitehurst's presence near the Haley shooting and efforts to use his car to block Haley's egress after appellant's shots proved nonfatal. It also suggests that appellant was enlisted to dispose of Haley and thereby conceal the robbery and murder of Ellerson (fifth *Banks* factor), even if he was not present at the time Ellerson was killed (fourth). In short, substantial evidence supports the trial court's findings regarding the *Banks* factors, both individually and collectively. We find no error in the court's conclusion that appellant was a major participant in the crimes that culminated in Ellerson's death.

We likewise find no error in its conclusion that appellant acted with reckless indifference to human life. The California Supreme Court articulated several factors relevant to determining whether a defendant acted with reckless indifference to human life in *People v. Clark* (2016) 63 Cal.4th 522, 618-623 (*Clark*). Those factors include: "Did the defendant use or know

15

that a gun would be used during the felony?  How many weapons were ultimately used? Was the defendant physically present at the crime?  Did he or she have the opportunity to restrain the crime or aid the victim?  What was the duration of the interaction between the perpetrators of the felony and the victims?  What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force?  What efforts did the defendant make to minimize the risks of violence during the felony?"  (*In re Scoggins* (2020) 9 Cal.5th 667, 677, citing *Clark*, *supra*, at pp. 618–623.)

The major participant and reckless indifference factors "significantly overlap" in that "'the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.'"  (*Clark*, *supra*, 63 Cal.4th at pp. 614-615, quoting *Tison v. Arizona* (1987) 481 U.S. 137, 153 (*Tison*).)  Consequently, the trial court's factual finding that appellant was a major participant in the robbery leading to Ellerson's death is supportive of the court's additional factual finding that appellant acted with reckless indifference to human life. (*People v. Cody* (2023) 92 Cal.App.5th 87, 113; see also *Tison*, *supra*, 481 U.S. at p. 158, fn. 12 [a defendant's status as a major participant in the underlying felony will "often provide significant support for [ ] a [reckless indifference] finding"].)

Reckless indifference to human life is also evident in appellant's actions against Haley. Left alone with Haley, appellant seized the opportunity to move forward with the broader robbery plan rather than restrain the crime.  He directed Haley to an area where Whitehurst was waiting, opened fire at him, and stood by while Whitehurst attempted to prevent Haley from leaving the scene.  There is no indication appellant

attempted to minimize the risks. Additionally, the duration of the broader plan was lengthy, with Ellerson and Haley waiting together for some period of time to execute the transaction before being separated, transported, and, ultimately, robbed and shot.

Substantial evidence supports the trial court's implicit findings regarding the *Clark* factors, both individually and collectively. We accordingly affirm its finding that appellant acted with reckless indifference to human life during the events that led to Ellerson's death.

## DISPOSITION

The order denying appellant's petition for resentencing under section 1172.6 is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

COLLINS, J.

We concur:

ZUKIN, P. J.

MORI, J.

17